**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED: APRIL 29, 2008
08CV2431            TG
JUDGE NORGLE
MAGISTRATE JUDGE SCHENKIER

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY, Individually
and On Behalf of All Others Similarly Situated,

                Plaintiff,

    vs.

LEHMAN BROTHERS HOLDINGS INC.,
RICHARD S. FULD, JR., CHRISTOPHER M.
O'MEARA and JOSEPH M. GREGORY,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CIVIL ACTION NO.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Southeastern Pennsylvania Transportation Authority ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lehman Brothers Holdings Inc. ("Lehman Brothers" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of Lehman Brothers' securities between September 13, 2006 and July 30, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Lehman Brothers provides an array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.   The Company operates three business segments:   Capital Markets, Investment Banking and Investment Management.   Lehman Brothers generates client-flow revenues from institutional, corporate, government, and high-net-worth clients by advising on and structuring transactions.  The Company also serves as a market maker and/or intermediary in the global marketplace, including securities and other financial instrument products, originating loans for distribution to clients in the securitization or principals market, providing investment management and advisory services, and acting as an underwriter to clients.

3.     In the fall of 2006 and through the summer of 2007, Lehman Brothers was heavily, and increasingly, invested in collateralized debt obligations ("CDOs") and subprime mortgage backed derivatives and was an aggressive participant in the mortgage backed security origination sector.  As a result, the Company actively carried financial positions linked to these instruments on its balance sheet and reported the "value" of these positions to the Company's investors.

4.     As the summer of 2007 unfolded, Lehman Brothers began to disclose facts (which it withheld during the Class Period) regarding the proper value of its positions in subprime and related securities.   The first disclosure occurred on July 10, 2007 when Lehman Brothers announced that it had "unrealized" losses of $459 million in the quarter (ended May 31, 2007)

from mortgages and mortgage-backed assets in its inventory. On that same day, *Bloomberg* reported that Standard & Poor's ("S&P") indicated that it may cut ratings on $12 billion of bonds backed by subprime mortgages. This would significantly cut into Lehman Brothers' trading profits as the Company was the largest underwriter of mortgage bonds. On this news, the Company's shares fell $3.76 per share, or over 5 percent, to close on July 10, 2007 at $71.10 per share, on unusually heavy trading volume.

5.      Throughout the remainder of the Class Period, Lehman Brothers continued to downplay the risks associated with owning these CDOs and related securities, and the nature and true extent of the Company's exposure to subprime related assets and financial positions. For example, on July 18, 2007, Lehman Brothers denied speculation that it would face greater potential losses from subprime mortgages than those previously disclosed to investors, stating: "The rumors related to subprime exposure are unfounded."

6.      Contrary to the Company's assurances about its exposure, *Bloomberg* reported, on July 26, 2007, that the risk of owning Lehman Brothers' bonds "soared" and its share price plunged "as concerns escalated that investment banks will be hurt by losses from subprime mortgages and corporate debt." The article went on to state that credit-default swaps (five-year contracts used to bet on the companies' creditworthiness) on $10 million of the Company's bonds jumped as much $24,000 to $104,000 a year. Subsequently, the cost of credit-default swaps protecting Lehman Brothers' obligations against default surged to $465,000 a year. Such increases in the cost of credit-default swaps signaled a significant deterioration in investor confidence. On this news, the Company's shares fell an additional $3.16 per share, or 4.7 percent, to close on July 26, 2007 at $64.50 per share, again on unusually heavy trading volume.

7.      Then on July 31, 2007, *Bloomberg* reported that "on Wall Street, Bear Stearns

3

Cos., Lehman Brothers Holdings Inc., Merrill Lynch & Co. and Goldman Sachs Group Inc., are as good as junk." This was because the bonds of the investment banks lost about $1.5 billion of their face value as the risk of owning the securities had dramatically increased. The prices of credit-default swaps for Lehman Brothers, the number one mortgage bond underwriter, equated to a Ba1 rating, implying that the Company's credit ratings were below investment grade. On this news, the Company's shares fell an additional $2.80 per share, or over 4.3 percent, to close on July 31, 2007 at $62.00 per share, again on heavy trading volume.

8. The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business operations, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company had failed to fully disclose the nature and extent of its exposure to losses incurred from trading in subprime mortgage backed derivatives; (2) that the Company had failed to fully disclose the nature and extent of its exposure to losses incurred from CDOs, and had failed to timely write-down its positions in these securities; (3) that the Company had failed to fully disclose the nature and extent of its exposure to losses incurred from mortgage backed security originations, and had failed to timely write-down its positions in these securities; (4) that the Company had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages; (5) that the Company had inadequate reserves for its mortgage and credit related exposure; (6) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and (7) that the Company lacked adequate internal and financial controls.

9. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered

significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391 because, among other things, the conduct complained of herein effected persons in this District.  Additionally, Lehman Brothers conducts business in this Judicial District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff, Southeastern Pennsylvania Transportation Authority, as set forth in the accompanying certification, incorporated by reference herein, purchased Lehman Brothers' securities at artificially inflated prices during the Class Period and has been damaged thereby.

15.     Defendant Lehman Brothers is a Delaware corporation with its principal executive offices located at 745 Seventh Avenue, New York, New York.

16.     Defendant Richard S. Fuld, Jr. ("Fuld") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

17.     Defendant Christopher M. O'Meara ("O'Meara") was, at all relevant times, the Company's Chief Financial Officer ("CFO"), Controller and Executive Vice President.

18.     Defendant Joseph M. Gregory ("Gregory") was, at all relevant times, the Company's President and Chief Operating Officer ("COO").

19.     Defendants Fuld, O'Meara and Gregory are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lehman Brothers' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Lehman Brothers provides an array of services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. The Company operates three business segments: Capital Markets, Investment Banking and Investment Management. Lehman Brothers generates client-flow

revenues from institutional, corporate, government, and high-net-worth clients by advising on and structuring transactions. The Company also serves as a market maker and/or intermediary in the global marketplace, including securities and other financial instrument products, originating loans for distribution to clients in the securitization or principals market, providing investment management and advisory services, and acting as an underwriter to clients.

**Materially False and Misleading
Statements Issued During the Class Period**

21.    The Class Period begins on September 13, 2006. On this day, the Company issued a press release entitled "Lehman Brothers Reports Third Quarter Results; Reports Net Income of $916 Million and Net Reserves of $4.2 Billion." Therein, the Company, in relevant part, stated:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $916 million for the third quarter ended August 31, 2006, or $1.57 per common share (diluted), representing increases of 4% and 7%, respectively, from net income of $879 million, or $1.47 per common share (diluted), reported for the third quarter of fiscal 2005. Second quarter fiscal 2006 net income was $1.0 billion, or $1.69 per common share (diluted).
>
> For the first nine months of fiscal 2006, the Firm reported record net income of $3.0 billion, or $5.09 per common share (diluted), up 23% and 26%, respectively, from the first nine months of fiscal 2005.
>
> **Third Quarter Business Highlights**
>
> • Reported record quarterly net revenues in Investment Management and Europe
>
> • Posted record net revenues in the nine-month period across all segments and regions
>
> * * *

7

Chairman and Chief Executive Officer Richard S. Fuld, Jr. said, "Market conditions during the third quarter were clearly more challenging than during the first half of the year. However, despite the market environment and the typically slower activity of the summer months, these results are our best third quarter results ever. These results also contributed to our best nine months ever, which were driven by record performances across all segments and regions. This performance demonstrates the Firm's ability to partner with our clients across cycles and to continue to deliver consistent returns to our shareholders."

Net revenues (total revenues less interest expense) for the third quarter of fiscal 2006 increased to $4.2 billion, up 8% from $3.9 billion in the third quarter of fiscal 2005, and down 5% from $4.4 billion in the second quarter of fiscal 2006. Net revenues for the first nine months of fiscal 2006 increased 19%, to a record $13.1 billion, from $10.9 billion for the first nine months of fiscal 2005.

Investment Banking revenues decreased 11% to $726 million in the third quarter of fiscal 2006, from $815 million in the third quarter of fiscal 2005, reflecting a decrease in completed M&A transactions and equity origination volumes. At August 31, 2006, the Investment Banking fee pipeline was at a record level. *Capital Markets net revenues in the third quarter of fiscal 2006 rose 13% to $2.8 billion, compared to $2.5 billion for the same period in fiscal 2005, representing the third highest quarter ever for the segment.* Equities Capital Markets reported strong net revenues of $837 million, up 31% from $637 million in the third quarter of 2005, driven by solid customer flow activity in the cash and prime brokerage businesses. *Fixed Income Capital Markets net revenues increased 6% to $2.0 billion in the third quarter of fiscal 2006 from $1.9 billion in the third quarter of 2005, reflecting record results in real estate and strong results in foreign exchange products, partially offset by lower performances within mortgages, high yield and interest rate products.* Record Investment Management net revenues, which increased 18% to $605 million in the third quarter of fiscal 2006 compared to $511 million a year ago, were attributable to record Private Investment Management revenues, which increased 7% to $256 million from $239 million a year ago, and higher Asset Management revenues. Asset Management reported its second highest revenues ever of $349 million, an increase of 28% from $272 million a year ago. Assets under management grew to a record $207 billion. [Emphasis added.]

8

22.     On October 10, 2006, Lehman Brothers filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendant O'Meara and reaffirmed the Company's financial results previously announced on September 13, 2006.

23.     The Company's 10-Q filed on October 10, 2006 also contained Sarbanes-Oxley required certifications, signed by Defendants Fuld and O'Meara, who certified the following:

> 1.     I have reviewed this quarterly report on Form 10-Q of Lehman Brothers Holdings Inc.;
>
> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. Section 1350), I, [Richard S. Fuld, Jr. / Christopher M. O'Meara], certify that:

1.     The Quarterly Report on Form 10-Q for the quarter ended August 31, 2006 (the "Report") of Lehman Brothers Holdings Inc. (the "Company") as filed with the Securities and Exchange Commission as of the date hereof, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

24.     On December 14, 2006, the Company issued a press release entitled "Lehman Brothers Reports Record Net Revenues, Net Income and Earnings per Share for Fiscal 2006; Reports Record Quarterly Net Revenues for the Fourth Quarter of Fiscal 2006."  Therein, the Company, in relevant part, stated:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $1.0 billion, or $1.72 per common share (diluted), for the fourth quarter ended November 30, 2006, representing increases of 22% and 25%, respectively, from net income of $823 million, or $1.38 per common share (diluted), reported for the fourth quarter of fiscal 2005. Third quarter fiscal 2006 net income was $916 million, or $1.57 per common share (diluted).
>
> For the 2006 full fiscal year, net income and earnings per common share (diluted) increased 23% and 25%, respectively, to a record $4.0 billion and $6.81, respectively, compared to $3.3 billion and $5.43, respectively, in fiscal 2005.
>
> **Full Year Business Highlights**
>
> - Reported record net revenues, net income and earnings per share (diluted) for the third consecutive year
>
> - Achieved record net revenues across all business segments and regions for the year
>
> * * *
>
> Richard S. Fuld, Jr., chairman and chief executive officer, said, "Once again, we have achieved outstanding results across all our business segments and geographic regions this year. Our record performance is the result of our client-focused strategy and our continued investment in strategic areas that enable us to deliver the best capabilities, intellectual capital and solutions to our clients. As always, our success is a tribute to how well our people continue to work together across the Firm to deliver superior value to our clients and shareholders."
>
> Net revenues (total revenues less interest expense) for the fourth quarter of fiscal 2006 were $4.5 billion, an increase of 23% from $3.7 billion reported in the fourth quarter of fiscal 2005 and an increase of 8% from the $4.2 billion reported in the third quarter of fiscal 2006. Investment Banking revenues were a record for the

quarter, increasing 5% to $858 million from $817 million in the fourth quarter of fiscal 2005. These revenues were driven by strong performances in debt and equity origination, which increased 14% and 7%, respectively, from the prior year's period, and solid merger and acquisition advisory revenue, which decreased 7% from the record results in the fourth quarter of fiscal 2005. *Capital Markets net revenues increased 28% to $3.0 billion in the fourth quarter of fiscal 2006 from $2.4 billion in the prior year's fourth quarter on strong performances from both Fixed Income and Equities Capital Markets. Fixed Income Capital Markets reported its second highest revenue quarter, an increase of 31% from the fourth quarter of fiscal 2005, reflecting strong levels of client activity, as well as improved results in credit products.* Equities Capital Markets also reported its second highest revenue quarter, an increase of 22% compared to the fourth quarter of fiscal 2005, driven by solid customer flow activities, improved market conditions and continued growth in the prime brokerage businesses. The Firm also reported its highest revenue quarter in Investment Management, with net revenues increasing 26% to $640 million in the fourth quarter of fiscal 2006, from $509 million in the fourth quarter of fiscal 2005. This performance was driven by record revenues in Private Investment Management and record-matching revenues in Asset Management. Assets under management grew to a record $225 billion.

For the full 2006 fiscal year, net revenues increased 20% to a record $17.6 billion, from $14.6 billion for fiscal 2005, *with record net revenues in each business segment and in each region*. For fiscal 2006, non-U.S. revenues grew 21% to a record $6.5 billion, representing 37% of Firmwide net revenues. [Emphasis added.]

25.     On February 13, 2007, Lehman Brothers filed its 2006 Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by Defendants Fuld and O'Meara and reaffirmed the Company's financial results previously announced on December 14, 2006. The Company's 10-K also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶23, *supra*, which were signed by Defendants Fuld and O'Meara.

26.     On March 14, 2007, the Company issued a press release entitled "Lehman Brothers Reports Record First Quarter Results; Reports Record Net Revenues, Net Income and Earnings Per Share." Therein, the Company, in relevant part, stated:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported record net income of $1.15 billion, or $1.96 per common share (diluted), for the first quarter ended February 28, 2007, representing increases of 6% and 7%, respectively, from net income of $1.09 billion, or $1.83 per common share (diluted), reported for the first quarter of fiscal 2006. Fourth quarter fiscal 2006 net income was $1.00 billion, or $1.72 per common share (diluted). The 2006 first quarter results include an after-tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.
>
> **First Quarter Business Highlights**
>
> • Reported record net revenues in the Capital Markets and Investment Management segments
>
> * * *
>
> Chairman and Chief Executive Officer Richard S. Fuld, Jr. said, "By expanding our global footprint, building our capabilities and partnering with our clients, we have again posted record net revenues, net income and earnings per share. Our results clearly demonstrate that we are better positioned than ever to create value for our clients and our shareholders."
>
> Net revenues (total revenues less interest expense) for the first quarter of fiscal 2007 were a record $5.0 billion, an increase of 13% from $4.5 billion reported in the first quarter of fiscal 2006 and an increase of 11% from the $4.5 billion reported in the fourth quarter of fiscal 2006. ***Capital Markets reported record net revenues of $3.5 billion in the first quarter of fiscal 2007, an increase of 15% from $3.0 billion in the first quarter of fiscal 2006, driven by strong performances in both Fixed Income and Equities Capital Markets. Fixed Income Capital Markets reported net revenues of $2.2 billion, its second highest revenue quarter and an increase of 3% from $2.1 billion in the first quarter of fiscal 2006, reflecting record results in credit products as well as a strong performance in real estate, partially offset by declines in securitized products due to weakness in the U.S. residential mortgage sector and in interest rate products.*** Equities

> Capital Markets reported record net revenues of $1.3 billion, an increase of 42% from $944 million in the first quarter of fiscal 2006, driven by continued growth in execution services and prime brokerage activities, as well as solid customer flow activities and strong equity markets. Investment Banking reported its second highest revenue quarter, increasing 2% to $850 million from $835 million in the first quarter of fiscal 2006. These revenues were driven by record debt origination, which increased 4% to $428 million from $410 million in the first quarter of fiscal 2006, and strong merger and acquisition advisory revenues, which increased 9% to $247 million from $226 million in the first quarter of fiscal 2006, partially offset by lower revenues in equity origination as compared to the first quarter of fiscal 2006. Investment Management reported record net revenues of $695 million, an increase of 20% from $580 million in the first quarter of fiscal 2006. This performance was driven by record revenues in both Asset Management, which increased 13% to $416 million from $368 million in the first quarter of fiscal 2006, and Private Investment Management, which increased 32% to $279 million from $212 million in the first quarter of fiscal 2006. Assets under management grew to a record $236 billion. [Emphasis added.]

27. On April 9, 2007, Lehman Brothers filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendant O'Meara and reaffirmed the Company's financial results previously announced on March 14, 2007. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶23, *supra*, which were signed by Defendants Fuld and O'Meara.

28. On June 12, 2007, the Company issued a press release entitled "Lehman Brothers Reports Record Quarterly Results; Reports 25% Increase in Net Revenues, 27% Increase in Net Income and 31% Increase in Earnings Per Share from the Second Quarter of 2006." Therein, the Company, in relevant part, stated:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported record net income of $1.3 billion, or $2.21 per common share (diluted), for the second quarter ended May 31, 2007, representing increases of 27% and 31%, respectively, from net income of $1.0 billion, or $1.69 per common share (diluted), reported for the second quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of

14

fiscal 2007 increased 11% and 13%, respectively, from net income of $1.1 billion, or $1.96 per common share (diluted), reported for the first quarter of fiscal 2007.

For the first half of fiscal 2007, the Firm reported record net income of $2.4 billion, or $4.17 per common share (diluted), up 16% and 18%, respectively, from net income of $2.1 billion, or $3.52 per common share (diluted) for the first half of fiscal 2006. The 2006 first half results include an after tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.

**Second Quarter Business Highlights**

- Reported record net revenues in all business segments and in the Firm's European and Asian regions, including a 55% increase in Investment Banking revenues from the second quarter of fiscal 2006

* * *

Chairman and Chief Executive Officer Richard S. Fuld, Jr. said, "Our record results for the second quarter and the first half reflect our ongoing commitment to achieving diversified growth. With non-U.S. net revenues representing nearly half of our total net revenues for the quarter, our global platform is stronger and more balanced than ever. To build on this momentum, we remain focused on leveraging our resources and capabilities to maximize value for our clients and shareholders."

Net revenues (total revenues less interest expense) for the second quarter of fiscal 2007 were a record $5.5 billion, an increase of 25% from $4.4 billion reported in the second quarter of fiscal 2006 and an increase of 9% from the $5.0 billion reported in the first quarter of fiscal 2007. For the first six months of fiscal 2007, the Firm reported record net revenues of $10.6 billion, an increase of 19% from $8.9 billion for the first half of fiscal 2006.

***Capital Markets reported record net revenues of $3.6 billion in the second quarter of fiscal 2007, an increase of 17% from $3.1 billion in the second quarter of fiscal 2006, driven by a record performance in Equities Capital Markets. Fixed Income Capital Markets reported net revenues of $1.9 billion, a decrease of 14% from $2.2 billion in the second quarter of fiscal 2006, as strong client demand across most products and increased real estate and credit product revenues were more than offset by continued***

> ***weakness in the U.S. residential mortgage business and
> decreased revenues in the Firm's municipal and interest rate
> products businesses.*** Equities Capital Markets reported record net
> revenues of $1.7 billion, nearly double the $878 million reported in
> the second quarter of fiscal 2006. This performance was driven by
> record overall customer activity and strength in execution services,
> prime services and equity derivatives businesses, as well as
> profitable trading strategies. Investment Banking reported record
> revenues of $1.2 billion, an increase of 55% from $741 million in
> the second quarter of fiscal 2006. This increase was driven by
> record debt origination revenues, which rose 87% to $540 million
> from $289 million in the second quarter of fiscal 2006, record
> equity origination revenues, which rose 60% to $333 million from
> $208 million in the second quarter of fiscal 2006, and record
> advisory revenues, which rose 14% to $277 million from $244
> million in the second quarter of fiscal 2006. Investment
> Management reported record net revenues of $768 million, an
> increase of 30% from $592 million in the second quarter of fiscal
> 2006. This performance was driven by record net revenues in both
> Asset Management, which increased 33% to $460 million from
> $347 million in the second quarter of fiscal 2006, and Private
> Investment Management, which increased 26% to $308 million
> from $245 million in the second quarter of fiscal 2006. Assets
> under management grew to a record $263 billion.  [Emphasis
> added.]

29. The statements contained in ¶¶ 21 – 28 were materially false and misleading when
made because defendants failed to disclose or indicate the following: (1) that the Company had
failed to fully disclose the nature and extent of its exposure to losses incurred from trading in
subprime mortgage backed derivatives; (2) that the Company had failed to fully disclose the
nature and extent of its exposure to losses incurred from CDOs, and had failed to timely write-
down its positions in these securities; (3) that the Company had failed to fully disclose the nature
and extent of its exposure to losses incurred from mortgage backed security originations, and had
failed to timely write-down its positions in these securities; (4) that the Company had materially
overvalued its positions in commercial and subprime mortgages, and in securities tied to these
mortgages; (5) that the Company had inadequate reserves for its mortgage and credit related
exposure; (6) that the Company's financial statements were not prepared in accordance with

GAAP; and (7) that the Company lacked adequate internal and financial controls.

## The Truth Begins to Emerge

30.     On July 10, 2007, Lehman Brothers filed its Quarterly Report with the SEC on Form 10-Q.  The Company's 10-Q was signed by Defendant O'Meara and revealed that the Company had "unrealized" losses of $459 million in the quarter from mortgages and mortgage-backed assets in its inventory.  Additionally, the Company's 10-Q contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in ¶23, *supra*, which were signed by Defendants Fuld and O'Meara.

31.     On this news, the Company's shares fell $3.76 per share, or over 5 percent, to close on July 10, 2007 at $71.10 per share, on unusually heavy trading volume.  The statements contained in ¶30, *supra*, were false and misleading for the same reasons as those stated in ¶29, *supra*.

32.     Also on July 10, 2007, *Bloomberg* published an article entitled "Lehman Leads Brokerage Stocks Lower After S&P Subprime Warning."  The article, in relevant part, stated:

> Lehman Brothers Holdings Inc. led declines in shares of U.S. securities firms after Standard & Poor's said it may cut ratings on $12 billion of bonds backed by subprime mortgages, a move that could shave trading profits.
>
> * * *
>
> Some insurers and pension funds are required to sell bonds when they're downgraded, potentially depressing prices of $800 billion in subprime mortgage bonds and $1 trillion of collateralized debt obligations, which repackage mortgage bonds into new securities. Lehman and other Wall Street firms have seen their revenue from fixed-income trading and sales drop in the second quarter, mostly due to weakness in mortgages.
>
> "Downgrades further hurt the mortgage bond business of the securities firms," said David Hendler, an analyst at CreditSights Inc. "Although they've fallen a lot already and the rating agencies

usually are behind the curve, their downgrades bring down prices more."

S&P said today that it's preparing to lower the ratings on 2.1 percent of the $565.3 billion of subprime bonds issued in late 2005 through 2006 because of a worse-than-anticipated U.S. housing slump. The company said it's also reviewing the "global universe" of collateralized debt obligations, or CDOs, that contain subprime mortgages, which are loans to the least creditworthy borrowers.

33. On July 18, 2007, Punk Ziegel & Co. reduced its rating on Lehman Brothers' securities to "sell" from "market perform." As *Bloomberg* reported:

Punk Ziegel & Co. analyst Richard Bove recommended selling the shares of five New York-based brokerage firms and downgraded the three largest U.S. banks on concerns about the mortgage-market shakeout.

Bove reduced his ratings on Bear Stearns Cos., Goldman Sachs Group Inc., Lehman Brothers Holdings Inc., Merrill Lynch & Co. and Morgan Stanley to "sell" from "market perform" in a note to investors today. He lowered Bank of America Corp., Citigroup Inc., and JPMorgan Chase & Co. to "market perform" from "buy."

Uncertainty in pricing high-rated bonds linked to risky mortgages is causing the book value of financial stocks to be overstated, Bove said. Bear Stearns yesterday told investors in its two failed hedge funds that they will get little if any money back after "unprecedented declines" in the value of AAA rated securities used to bet on subprime mortgages.

"I do not view this as a Bear Stearns problem, but a systemic one," Bove wrote. "This opens investors to sizable losses which, at this moment, simply cannot be calculated."

34. Also on July 18, 2007, *Bloomberg* published an article entitled "Lehman Brothers Says Subprime Speculation 'Unfounded.'" The article, in relevant part, stated:

**Lehman Brothers Holdings Inc., the largest underwriter of U.S. mortgage bonds, denied speculation that it may face greater potential losses from subprime mortgages than previously disclosed.**

Speculation about a planned announcement from Lehman related to its subprime holdings spurred investors to demand higher

premiums to insure against the risk of owning Wall Street firms' bonds and helped prompt gains in Treasuries, according to traders including Thomas Tucci, head of U.S. government bond trading at RBC Capital Markets in New York.

***"The rumors related to subprime exposure are unfounded," Lehman spokeswoman Kerrie Cohen said today.*** [Emphasis added.]

35.     The statements contained in ¶34, *supra*, were false and misleading for the same reasons as those stated in ¶29, *supra*.

36.     On July 26, 2007, *Bloomberg* published an article entitled "Wall Street's Bond Risk Soars, Shares Plunge on Credit Concerns." The article, in relevant part, stated:

> The risk of owning bonds of Wall Street firms soared and their stocks plunged as concerns escalated that investment banks will be hurt by losses from subprime mortgages and corporate debt.
>
> Credit-default swaps on $10 million of Goldman Sachs Group Inc. bonds jumped as much as $18,000 to a record $85,000, according to broker Phoenix Partners Group in New York. Bear Stearns Cos. credit swaps surged as much as $29,000 to $110,000, also a new high. Lehman Brothers Holdings Inc. climbed as much as $24,000 to $104,000. Goldman shares declined as much as 7 percent, Bear Stearns fell as much as 7.5 percent and Lehman dropped 8.3 percent.
>
> * * *
>
> An increase in the credit-default swaps, which are five-year contracts used to bet on the companies' creditworthiness, signals deterioration in investor confidence.

37.     On this news, the Company's shares fell $3.16 per share, or 4.7 percent, to close on July 26, 2007 at $64.50 per share, on unusually heavy trading volume.

38.     On July 30, 2007, *Bloomberg* published an article entitled "Wall Street Results to Fall on Credit 'Re-Pricing.'" The article, in relevant part, stated:

> U.S. securities firms' profitability will decline as investor aversion to risky debt eats into bond underwriting fees, Sanford C. Bernstein & Co. analyst Brad Hintz said.

The "re-pricing of credit risk" will cut the return on equity at Goldman Sachs Group Inc., Morgan Stanley and Lehman Brothers Holdings Inc. by 2 percentage points in 2008, Hintz estimated in a report published today. Merrill Lynch & Co.'s ROE, a gauge of how effectively earnings are reinvested, will fall by 1 point. Under a "potential worst case," the firms' return on equity would drop further, he said.

\* \* \*

Prices for riskier bonds and loans, and for derivatives based on those securities, have declined as surging defaults on U.S. home mortgages to subprime borrowers quashed investor appetite for risk. Subprime loans are made to home buyers with the worst credit records.

39.     The following day, on July 31, 2007, *Bloomberg* published an article entitled "Bear, Lehman, Merrill, Goldman Traded as Junk, Derivatives Show." The article, in relevant part, stated:

> *On Wall Street, Bear Stearns Cos., Lehman Brothers Holdings Inc., Merrill Lynch & Co. and Goldman Sachs Group Inc., are as good as junk.*
>
> *Bonds of U.S. investment banks lost about $1.5 billion of their face value this month as the risk of owning the securities increased* the most since at least October 2004, according to Merrill indexes. *Prices of credit-default swaps based on the debt imply that their credit ratings are below investment grade, data compiled by Moody's Investors Service show.*
>
> *The highest level of defaults in 10 years on subprime mortgages and a $33 billion pileup of unsold bonds and loans for funding acquisitions are driving investors away from debt of the New York-based securities firms.* Concerns about credit quality may get worse because banks promised to provide $300 billion in debt for leveraged buyouts announced this year.
>
> \* \* \*
>
> *Prices of credit-default swaps for Goldman, the biggest investment bank by market value, Merrill, the third largest, and Lehman, the No. 1 mortgage bond underwriter, also equate to a Ba1 rating, data from Moody's credit strategy group show. Bonds of New York-based Goldman and Merrill are rated Aa3, seven*

> *levels higher than swaps suggest. Lehman is rated A1, the same*
> *as Bear Stearns.* [Emphasis added.]

40. On this news, the Company's shares fell an additional $2.80 per share, or over 4.3

percent, to close on July 31, 2007 at $62.00 per share, on unusually heavy trading volume.

### Post-Class Period Developments

41. On August 2, 2007, *The Wall Street Journal* published an article entitled

"Subprime Detectives Search in Dark for Next Victim – Wall Street Can Bury Mistakes in Fine

Print." The article, in relevant part, stated:

> But investors in banks and brokerage houses also have been
> spooked by what they can't see. Namely, *potential losses that*
> *many fear have been hidden in the books of financial firms, or*
> *stuffed in off-balance-sheet vehicles.*
>
> *That has made it difficult for investors to gauge exactly who has*
> *lost money on subprime wagers and how much has gone up in*
> *smoke.*
>
> *The uncertainty has hit stocks of financial houses that so far*
> *have said they don't have any major subprime problems.*
> Deutsche Bank AG was one of yesterday's casualties. The German
> bank reported upbeat profit and said it wasn't exposed to the
> subprime crisis, but investors drove its stock down more than 2%
> on the Frankfurt stock exchange. Merrill Lynch & Co. has fallen
> about 22% since the start of the year, Citigroup Inc. is off 16%
> since January, and *Lehman Brothers Holdings Inc. is down about*
> *22%.*
>
> The mystery of "where are the losses?" has confounded hedge
> funds searching for opportunities to bet against banks whose day of
> reckoning has yet to come.
>
> *"We've been looking for financials that show losses from these*
> *securities on their books, and they've been very difficult to find,"*
> says Keith Long, president of Otter Creek Management, a hedge
> fund in Palm Beach, Fla., with $150 million in assets. "It's very
> opaque."
>
> Investors have long complained about the lack of transparency
> when it comes to huge financial firms, *whose balance sheets are*
> *so big that they can easily mask multimillion-dollar gains or*

*losses.* Analysts and investors currently cite several potential factors that could help hide subprime wounds.

*Corporate executives and fund managers may still be relying on inflated values for mortgage-related securities.* The widespread use of off-balance-sheet vehicles by banks and other financial institutions may also enable them to shift losses elsewhere. And *a menu of choices offered to companies by accounting rules allows management to decide whether to recognize certain losses or push bad news into the future.*

\* \* \*

While serious problems have yet to emerge for many larger financial players, *it is "likely that institutions have large embedded losses" that are so far being hidden*, says Josh Rosner, managing director of Graham Fisher & Co., an independent research firm.

*Many securities that have taken a bath mightn't be showing up as a result of the use of "false marks,"* Mr. Rosner adds. In Wall Street parlance, a mark is the current market price of a security. Companies valuing their holdings say they are marking them to market. It is tough to get an accurate value, or mark, for some securities, such as those issued by investment vehicles known as collateralized debt obligations.

These vehicles pool various debt instruments, in many case mortgage-backed securities underpinned by subprime loans, and then sell slices that vary in terms of the risk of default.

There isn't an active market for many CDOs, and they don't have observable prices. Instead, *to value such securities, companies and investment funds often rely on quotes from dealers, which may be unrealistic, out of date or based on their own internal investment models*.

*That often results in what is called "marking to model," a practice that can allow a firm to take an unrealistically optimistic view that overlooks potential losses. Some firms engage in "very aggressive marking,"* said Otter Creek's Mr. Long. *"Until people are forced to liquidate because of redemptions, the marks will hold up."*

A looming accounting-rule change might help, though it won't formally kick in until companies file financial results for 2008. The new rule requires companies and auditors to determine how much

a security would be worth if it were sold to an unrelated third party in an arms-length transaction.

That would require a company to think about market risk, which could result in a discount being applied to a security's value when times are tough. It also may force companies to look beyond a dealer "quote" and consider what actually would be a market-clearing price for a security. During times of market stress, there can be a wide difference between a quote and a clearing price.

The new accounting rule won't radically change the way companies price hard-to-value securities, but it will "require *a more realistic way of choosing value, and the auditors will have to enforce that*," says Edward Ketz, an accounting professor at Pennsylvania State University. A potentially bigger plus is that the rule will require beefed-up disclosures from companies as to how they are valuing different types of instruments, Prof. Ketz says.

\* \* \*

Another way companies and banks might hide losses on securities backed by risky mortgages is to classify them for accounting purposes as being "held to maturity." This effectively precludes a company or bank from selling the security, but also means that it doesn't have to mark the security to market on its books.

Instead, the security stays on the books at its historical cost. Investors won't know if companies tried this maneuver until they file annual results for 2007, in which case they would have to disclose the amount of securities classified this way during the year, Prof. Ketz says. [Emphasis added.]

42.    On this news, the Company's shares fell an additional $4.67 per share, or over 7.7 percent, to close on August 3, 2007 at $55.78 per share, on unusually heavy trading volume.

43.    On August 9, 2007, *Bloomberg* published an article entitled "U.S. Broker Estimates Cut by Analysts on Credit Woes." The article, in relevant part, stated:

Wall Street's biggest securities firms may earn less than previously estimated this year as widening losses on subprime mortgages tighten credit markets and threaten to end the boom in takeovers, analysts said.

*Lehman Brothers Holdings Inc. and Bear Stearns Cos., the fourth- and fifth-biggest U.S. securities firms, had their 2007 and*

23

> ***2008 profit estimates cut 7 percent*** by Sanford C. Bernstein & Co. analyst Brad Hintz.
>
> Hintz, ***the third analyst this week to reduce estimates for brokerages***, also lowered his profit forecast for the top three U.S. securities firms -- Goldman Sachs Group Inc., Morgan Stanley and Merrill Lynch & Co.
>
> "Key businesses such as fixed-income trading should face slowing business and increasing volatility," Hintz, the third-ranked brokerage-industry analyst according to Institutional Investor magazine, wrote in a note to investors. "High-margin financing activities -- such as high yield debt underwriting -- that serve as revenue catalysts are becoming more challenging."
>
> Hintz expects Lehman, the largest underwriter of U.S. mortgage bonds, to earn $7.37 a share this year and $7.63 in 2008. That's down from his previous prediction of $7.87 a share and $8.20, respectively.
>
>               * * *
>
> Citi Investment Research analyst Prashant Bhatia wrote yesterday that investment banks may be stuck with $75 billion of leveraged-buyout loans that could reduce annual earnings by 2 percent to 5 percent.
>
> On Aug. 6, UBS AG analyst Glenn Schorr lowered his 2007 earnings estimate for Bear Stearns, the second-largest underwriter of mortgage-backed securities, by 15 percent to $12.46 a share. He also reduced his estimates for Goldman, Lehman, Merrill and Morgan Stanley. [Emphasis added.]

44. On August 10, 2007, *Business Week* published an article entitled "Subprime Woes Wallop Wall Street Firms." The article, in relevant part, stated:

> As more news about the looming credit crunch slapped major stock indexes lower on Thursday, the U.S.'s big investment banks got hit even harder.
>
> Standard & Poor's investment bank and brokerage sector tumbled 4.67% on Thursday. Big Wall Street players were pummeled. Bear Stearns (BSC), Goldman Sachs (GS) and Morgan Stanley (MS) all fell more than 5%, and ***Lehman Brothers (LEH) dropped more than 7%***. Market anxiety had already caused financial stocks to drop more than 5% in the last month.

* * *

*One problem for big investment banks and hedge funds is they reveal very little to the public or investors about their internal holdings.*

*"We don't know how many hidden skeletons there are in anybody's closet,"* Larkin says.

* * *

We may need to wait until next month, when many firms announce earnings, to get a better sense of the damage done this summer, Larkin says. [Emphasis added.]

45.     On August 10, 2007, *Bloomberg* published an article entitled "SEC Scrutinizes Wall Street's Subprime Accounting." The article, in relevant part, stated:

The U.S. Securities and Exchange Commission, concerned that *Wall Street firms may have concealed the extent of the subprime-mortgage rout, will examine how the biggest brokerages accounted for the securities as they plummeted*, a person with direct knowledge of the inquiry said.

The SEC's inspections office plans to scrutinize whether firms including Goldman Sachs Group Inc. and Merrill Lynch & Co. inaccurately valued their own subprime investments or those held by clients, said the person, who declined to be named because the review is confidential.

* * *

"As liquidity dries up, prices are harder to set," said Lawrence White, a professor of economics at New York University. *The SEC may ask whether the firms' valuation methods amounted to "shading the results to benefit themselves,"* he said. [Emphasis added.]

46.     On September 18, 2007, the Company issued a press release entitled "Lehman Brothers Reports Third Quarter Results; Reports Net Income of $887 Million and Net Revenues of $4.3 Billion." The press release, in relevant part, stated:

Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $887 million, or $1.54 per common share (diluted), for the third quarter ended August 31, 2007, representing

decreases of 3% and 2%, respectively, from net income of $916 million, or $1.57 per common share (diluted), reported for the third quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 were $1.3 billion and $2.21, respectively.

* * *

***Capital Markets reported net revenues of $2.4 billion for the third quarter of fiscal 2007, a decrease of 14% from $2.8 billion in the third quarter of fiscal 2006. Fixed Income Capital Markets reported net revenues of $1.1 billion, a decrease of 47% from $2.0 billion in the third quarter of fiscal 2006, primarily due to lower performances within Credit and Securitized Products. Within Fixed Income Capital Markets, the Firm recorded very substantial valuation reductions, most significantly on leveraged loan commitments and residential mortgage-related positions. These losses were partially offset by large valuation gains on economic hedges and other liabilities. The result of these valuation items was a net reduction in revenues of approximately $700 million.*** Equities Capital Markets reported its second highest net revenue quarter, with net revenues of $1.4 billion, an increase of 64% from $837 million in the third quarter of fiscal 2006. This performance was driven by strong client activity in both Cash and Derivative Products, and represents the third straight quarter that Equities Capital Markets has surpassed $1 billion in net revenues. Investment Banking also reported its second highest net revenue quarter, with net revenues of $1.1 billion representing an increase of 48% from $726 million in the third quarter of fiscal 2006. This performance was driven by record advisory net revenues, which more than doubled to $425 million from $195 million in the third quarter of fiscal 2006, as well as strong equity origination net revenues, which rose 62% to $296 million from $183 million in the third quarter of fiscal 2006. For the quarter, debt origination net revenues were $350 million, consistent with $348 million reported in the third quarter of fiscal 2006. Investment Management reported record net revenues of $802 million, an increase of 33% from $605 million in the third quarter of fiscal 2006. This performance was driven by record Private Investment Management net revenues, which increased 30% to $334 million from $256 million in the third quarter of fiscal 2006, and record Asset Management net revenues, which increased 34% to $468 million from $349 million in the third quarter of fiscal 2006. Assets under management grew to a record $275 billion. [Emphasis added.]

47.     On December 13, 2007, the Company issued a press release entitled "Lehman

Brothers Reports Record Net Revenues, Net Income and Earnings Per Share for Fiscal 2007;

Reports Net Income of $886 Million and Net Revenues of $4.4 Billion for the Fourth Quarter of

Fiscal 2007." The press release, in relevant part, stated:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $886 million, or $1.54 per common share (diluted), for the fourth quarter ended November 30, 2007, representing decreases of 12% and 10%, respectively, from net income of $1.0 billion, or $1.72 per common share (diluted), reported for the fourth quarter of fiscal 2006. For the third quarter of fiscal 2007, net income was $887 million, or $1.54 per common share (diluted).

> \* \* \*

> Net revenues (total revenues less interest expense) for the fourth quarter of fiscal 2007 were $4.4 billion, a decrease of 3% from $4.5 billion reported in the fourth quarter of fiscal 2006 and an increase of 2% from $4.3 billion reported in the third quarter of fiscal 2007. *Capital Markets net revenues decreased 10% to $2.7 billion in the fourth quarter of fiscal 2007 from $3.0 billion in the fourth quarter of fiscal 2006. Fixed Income Capital Markets reported net revenues of $860 million, a decrease of 60% from $2.1 billion in the fourth quarter of fiscal 2006, due to the very challenging markets experienced during the period,* although strong results from client activity were reported in the Foreign Exchange and Commodities businesses. *Fixed Income Capital Markets recorded negative valuation adjustments on trading assets, principally in the Firm's Securitized Products and Real Estate businesses. These valuation adjustments were offset, in part, by valuation gains on economic hedges and liabilities, as well as realized gains from the sale of certain leveraged loan positions, resulting in a net revenue reduction in Fixed Income Capital Markets of approximately $830 million.* Equities Capital Markets reported record net revenues of $1.9 billion, more than double the $900 million reported in the fourth quarter of fiscal 2006. This performance was driven by solid customer flow activities as well as gains from private equity and the Firm's investment in GLG Partners. These results represent the fourth straight quarter that Equities Capital Markets has surpassed $1 billion in net revenues. Investment Banking reported net revenues of $831 million, a decrease of 3% from $858 million in the fourth quarter of fiscal 2006, driven by declines in debt and equity origination revenues, which decreased 38% and 6%, respectively, from the prior year's period. Merger and acquisition advisory

27

> reported its second-highest net revenue quarter, an increase of 52%
> from the fourth quarter of fiscal 2006. Investment Management
> reported record net revenues of $832 million in the fourth quarter
> of fiscal 2007, an increase of 30% from $640 million in the fourth
> quarter of fiscal 2006. This performance was driven by record
> revenues in Asset Management and strong revenues in Private
> Investment Management. Assets under management grew to a
> record $282 billion. [Emphasis added.]

48.     The above disclosures, coupled with subsequent disclosures, only served to further reduce the value of the Company's securities. As the credit and subprime markets continued to crumble, rating agencies further lowered their outlook for the Company, with Moody's Investors Service stating that "the value of the firm's assets is declining." Analysts also correctly predicted that the Company would be exposed to significant further write-downs, declining revenue, and a compressed return on equity (a measure of how effectively a Company reinvests its earnings). One analyst stated that until "troubled assets" of $87 billion "are removed from Lehman's balance sheet, we would expect the firm will be exposed to further write-downs in the upcoming quarters." These events, combined with the Company's belated disclosures about the true nature and extent of its financial exposure, eventually lead to a run on its assets and further devaluation of its securities, raising the possibility that the Company would seek bankruptcy protection or to be acquired. The Company was also forced to seek significant capital in an effort to strengthen its liquidity position, which included the raising of $4 billion by selling convertible preferred shares.

## LEHMAN BROTHERS' VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## FILED WITH THE SEC

49.     These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations

due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

50.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

51.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

> (a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

> (b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

> (c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts

No. 1, ¶40);

(d)    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(f)    The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)    The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

52.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Lehman Brothers' securities between September 13, 2006 and July 30, 2007, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Lehman Brothers' securities were actively traded on the New York Stock Exchange ("NYSE").   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Lehman Brothers, or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

 (a) whether the federal securities laws were violated by defendants' acts as alleged herein;

 (b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lehman Brothers; and

 (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

58. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

59. The market for Lehman Brothers' securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, Lehman Brothers' securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Lehman Brothers' securities relying upon the integrity of the market price of Lehman Brothers' securities and market information relating to Lehman Brothers, and have been damaged thereby.

60. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Lehman Brothers' securities, by publicly issuing false and

misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

61. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Lehman Brothers' financial well-being, business operations, and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Lehman Brothers and its financial well-being, business operations, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

62. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

63. During the Class Period, Plaintiff and the Class purchased Lehman Brothers' securities at artificially inflated prices and were damaged thereby. The price of Lehman Brothers' securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

64. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Lehman Brothers, their control over, and/or receipt and/or modification of Lehman Brothers' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Lehman Brothers, participated in the fraudulent scheme alleged herein.

65. Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 2,285,349 shares of the Company's stock for gross proceeds of $173,018,000. Of that figure, over $146.8 million in gross proceeds were received by the Individual Defendants. This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| June 15, 2007 | Russo, Thomas A. | 187,289 | $78.65 - $79.10 | $14,772,000 |
| June 15, 2007 | Russo, Thomas A. | 32,711 | $78.89 | $2,581,000 |
| June 13, 2007 | Fuld, Richard S. | 291,864 | $77.20 - $77.75 | $22,612,000 |
| June 13, 2007 | Fuld, Richard S. | 508,136 | $77.56 | $39,411,000 |
| April 23, 2007 | Gregory, Joseph M. | 495,503 | $77.59 - $78.12 | $38,577,000 |
| November 30, 2006 | Friedheim, Scott J. | 6,411 | $73.67 | $472,000 |

34

| November 30, 2006 | Lowitt, Ian T. | 13,454 | $73.67 | $991,000 |
| November 30, 2006 | O'Meara, Christopher M. | 5,874 | $73.67 | $433,000 |
| November 30, 2006 | Russo, Thomas A. | 62,700 | $73.67 | $4,619,000 |
| November 30, 2006 | Gregory, Joseph M. | 72,251 | $73.67 | $5,323,000 |
| November 30, 2006 | Fuld, Richard S. | 74,460 | $73.67 | $5,485,000 |
| October 24, 2006 | Russo, Thomas A. | 34,696 | $77.65 - $78.02 | $2,701,000 |
| September 14, 2006 | Fuld, Richard S. | 244,300 | $69.60 - $70.20 | $17,077,000 |
| September 14, 2006 | Fuld, Richard S. | 255,700 | $70.10 - $70.41 | $17,964,000 |
| | | **2,285,349** | | **$173,018,000** |

## Applicability of Presumption of Reliance:
## Fraud On The Market Doctrine

66.     At all relevant times, the market for Lehman Brothers' securities was an efficient market for the following reasons, among others:

(a)     Lehman Brothers' securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Lehman Brothers filed periodic public reports with the SEC and the NYSE;

(c)     Lehman Brothers regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

35

(d)     Lehman Brothers was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

67.     As a result of the foregoing, the market for Lehman Brothers' securities promptly digested current information regarding Lehman Brothers from all publicly-available sources and reflected such information in the price of Lehman Brothers' securities. Under these circumstances, all purchasers of Lehman Brothers' securities during the Class Period suffered similar injury through their purchase of Lehman Brothers' securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

68.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Lehman Brothers who knew that those statements

were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Lehman Brothers' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

71.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Lehman Brothers' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

72.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lehman Brothers'

financial well-being, business operations and prospects, as specified herein.

73.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lehman Brothers' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Lehman Brothers and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Lehman Brothers' securities during the Class Period.

74.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

75. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Lehman Brothers' financial well-being, business operations, and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business operations, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lehman Brothers' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Lehman Brothers' securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Lehman Brothers' securities during the Class Period at artificially high prices and were damaged thereby.

77. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that

Lehman Brothers was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Lehman Brothers securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

78.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     The Individual Defendants acted as controlling persons of Lehman Brothers within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading

40

prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.     As set forth above, Lehman Brothers and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 29, 2008

Respectfully submitted,

By: _____

**LASKY & RIFKIND, LTD.**
Norman Rifkind
rifkind@laskyrifkind.com
Leigh Lasky
lasky@laskyrifkind.com
Amelia S. Newton
newton@laskyrifkind.com
350 N. LaSalle Street, Suite 1320
Chicago, IL 60610
(312) 634-0057
(312) 634-0059 (Fax)

*(Local Counsel for Plaintiff)*

**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Richard A. Maniskas
rmaniskas@sbtklaw.com
D. Seamus Kaskela
skaskela@sbtklaw.com
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (Fax)

**LABATON SUCHAROW LLP**
Christopher J. Keller
ckeller@labaton.com
Andrei V. Rado
arado@labaton.com
Alan I. Ellman
aellman@labaton.com
140 Broadway
New York, NY 10005
(212) 907-0700
(212) 818-0477 (Fax)
*Attorneys for Plaintiff*

## CERTIFICATION

The Southeastern Pennsylvania Transportation Authority ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint, and authorizes its filing,

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's purchase and sale transactions in Lehman Brothers Holdings, Inc. (NYSE: LEH) security that is the subject of this action during the Class Period are attached as Schedule A.

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein.

6.    During the three years prior to the date of this Certification, Plaintiff has sought to serve and is currently serving as a representative party for a class in an action filed under the federal securities laws against Marvell Technology Group, Ltd..

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **28** day of April, 2008.

Southeastern Pennsylvania Transportation Authority

By: _____

Nicholas J. Staffieri, *General Counsel*

**SEPTA**
**SCHEDULE A**

| Date | Purchase or Sale | Type of Securities | Number of Securities | Price of Securities |
|---|---|---|---|---|
| 11/3/2006 | Purchase | Com Stk | 6900 | 74.8426 |
| 11/8/2006 | Purchase | Com Stk | 320 | 74.7323 |
| 11/8/2006 | Purchase | Com Stk | 2180 | 74.825 |
| 12/11/2006 | Purchase | Com Stk | 280 | 76.8492 |
| 1/17/2007 | Purchase | Com Stk | 5350 | 83.5414 |
| 2/14/2007 | Purchase | Com Stk | 550 | 83.8695 |
| 4/25/2007 | Purchase | Com Stk | 680 | 76.5407 |
| | | | | |
| 10/5/2006 | Sale | Com Stk | 100 | 75.3949 |
| 10/11/2006 | Sale | Com Stk | 1100 | 74.89 |
| 1/4/2007 | Sale | Com Stk | 11800 | 77.1225 |
| 5/14/2007 | Sale | Com Stk | 1076 | 74.2079 |
| 5/14/2007 | Sale | Com Stk | 4824 | 74.2079 |
| 6/1/2007 | Sale | Com Stk | 1200 | 74.9764 |
| 7/24/2007 | Sale | Com Stk | 3400 | 67.7331 |
| 8/3/2007 | Sale | Com Stk | 3136 | 57.5017 |